UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

DMITRI PLOTNIKOV,                                    **VERIFIED
                                                      COMPLAINT**
                    Plaintiff,

        -against-
                                                     Case No.: _____

ELIZABETH A. LEDKOVSKY,

                    Defendant.

_____

# 07 CIV. 4088
# ROBINSON

Plaintiff, DMITRI PLOTNIKOV, by his attorney, THOMAS F. VASTI, III, ESQ., of the law

firm of VASTI & VASTI, P.C., complaining of the Defendant, ELIZABETH A. LEDKOVSKY,

respectfully shows to this Court and alleges, as follows:

## AS AND FOR A FIRST CAUSE OF ACTION:

1.      At all times hereinafter relevant, the Plaintiff, DMITRI PLOTNIKOV, was and is a

citizen of the United States of America.

2.      At all times hereinafter relevant, the Plaintiff, DMITRI PLOTNIKOV, was and is a

resident of the Country of Germany, County of _____, and City of Berlin.

3.      At all times hereinafter relevant, the Plaintiff, DMITRI PLOTNIKOV, has resided and

continues to reside at Gertrud-Kolmar Str 7, in the City of Berlin, and Country of Germany, 10117.

4.      Plaintiff has resided at such address since August 1, 2001 through and including the

present date. Such address is a spacious, three room apartment, (containing two bedrooms), located

within the heart of the City of Berlin. The aforesaid apartment use to bear the address of An der

Kolannade 12, Berlin, Germany 10117, (which is the address listed on the Plaintiff's U.S. Passport); but,

by virtue of a neighborhood redevelopment and street extension, the address of such apartment was

changed to Gertrud-Kolmar Str 7, Berlin, Germany 10117.

5.    At all times hereinafter relevant, the Defendant, ELIZABETH A. LEDKOVSKY, was

and is the lawfully wedded spouse of the Plaintiff, DMITRI PLOTNIKOV.

6.    At all times hereinafter relevant, the Defendant, ELIZABETH A. LEDKOVSKY, was

and is a citizen of the United States of America.

7.    At all times hereinafter relevant, the Defendant, ELIZABETH A. LEDKOVSKY, was

and is a resident of the Country of U.S.A., State of New York and the County of Dutchess.

8.    Since the date of May 31, 2006 through and including the present date, the Defendant,

ELIZABETH A. LEDKOVSKY, has resided and continues to reside ~~at 10 Axholm Dr. Salt Point, New~~

~~York 12578~~.

9.    Prior to the date of May 31, 2006, and since the date of August 1, 2001, the Defendant,

ELIZABETH A. LEDKOVSKY, resided with the Plaintiff, as his wife, at Gertrud-Kolmar Str 7, in the

City of Berlin, and Country of Germany, 10117.

10.    Plaintiff, DMITRY PLOTNIKOV, is forty-two (42) years of age.  Plaintiff was born in

Novosibirsk, Russia, on May 8, 1965; and, Plaintiff's national heritage is Russian. On August 18, 1991,

Plaintiff was invited to visit with a friend in the United States of America.  During such visit, Plaintiff

decided to relocate and immigrate to the United States of America. Thereafter, Plaintiff never returned

to his former residence in Russia, and decided to stay in America.  Subsequently, Plaintiff made the

decision to become a U.S. citizen; and, Plaintiff received his Certificate of Nationalization on January 4,

2000.

11.    The Defendant, ELIZABETH A. LEDKOVSKY, is the lawfully wedded spouse of the

Plaintiff, DMITRY PLOTNIKOV.  Defendant is thirty-eight (38) years of age.  Defendant was born in

New York City, on July 19, 1968; and, her national heritage is Russian. Both of the Defendant's parents, Alex & Olga Ledkovsky, are of Russian heritage, but they were born in Germany. Both of the Defendant's parents immigrated to America after World War II.

12. Plaintiff met the Defendant in 1999, in San Francisco, California, at a time when the Defendant was organizing a Russian Orthodox Concert, to which the Plaintiff was invited to perform as a singer. After dating for approximately two (2) years, the Plaintiff and the Defendant were married to each other on May 20, 2001, in the Town of Riverhead, County of Suffolk, State of New York. The marriage occurred at such location, as such was the "adopted hometown" of the Defendant's parents.

13. At the time of the parties' marriage, the Defendant was not employed, but the Plaintiff was working under contract with the City Theatre in Bremerhaven, Germany, where Plaintiff was also living. (Before that, the Plaintiff had worked as an opera singer in Slovenia.) Three (3) days after the parties were married, the parties moved to the Plaintiff's residence apartment in Bremerhaven, Germany, where the parties resided for several weeks until the parties moved into the above-identified apartment in the City of Berlin, on August 1, 2001. The parties made such move to Berlin, as the Plaintiff had been offered several new singing contracts of employment in the fields of theatre and opera; and, the Plaintiff had accepted a life-time contract as a singer with Germany's national opera company, known as "Staatsoper Unter den Linden", which company is principally based in Berlin. Plaintiff has held such position of employment since August 1, 2001 through and including the present date.

14. Since the date of our marriage, Plaintiff has held an extremely secure position of employment – as signified by the "life-time" nature of Plaintiff's current contract. (The term "life-time" contract is used herein, as Plaintiff's employment contract has an automatic renewal clause, and it is common knowledge that Plaintiff's employer has never fired anyone who has held an employment position such as the one held by the Plaintiff.) The Defendant has never worked during the parties'

marriage; and, upon information and belief, the Defendant has never sought any position of employment, by her own choice – even though she is capable of doing so. Plaintiff has never demanded anything different, as the German social system allows the Plaintiff to properly provide for his wife and children at the wages agreed upon within the Plaintiff's aforesaid employment contract.

15.     The Defendant's sister, Marina Ledkovsky-DeLong, is married to an individual named Jeff DeLong, who reside at a private, single-family residence located at ~~40 Audubon Trail~~, ~~Salt Point, New York~~. Thereafter, the Defendant's other sister, Nina Ledkovsky, was allowed to move-in with them. Thereafter, and following the death of the Defendant's father, Alex Ledkovsky, around Christmas, 2004, the Defendant's mother, Olga Ledkovsky, was allowed to move into the Salt Point residence. Aside from the foregoing people, the Defendant has no other family support system, with exception for a paternal uncle who still lives on Long Island and a paternal Aunt who lives in the southern part of America. The foregoing information is provided at this time, as the Defendant's connection to the foregoing family members and to the Salt Point residence is of great significance in this case.

16.     Approximately two (2) years after the parties married, the Defendant gave birth to the parties' first child, to wit: SEBASTIAN LEDKOVSKY-PLOTNIKOV, (AGE: 3½, and DOB: 6/28/2003). Approximately one and one-half (1½) years later, the Defendant gave birth to our second child, to wit: MAGDALENA LEDKOVSKY-PLOTNIKOV, (AGE: 2, and DOB: 1/5/2005). Both of the parties' children were born in Berlin, Germany.

17.     Pursuant to German Law, and because both of the parties were U.S. citizens at the time of the children's births, both of the parties' children were deemed U.S. citizens; and, passports and visas were immediately issued for both of them. Both of the parties' children have been, and still remain,

U.S. citizens.  The country of Germany does not bestow citizenship rights to children simply because they are born within the country.

18.    Since their birth and up to the current date, the only home that both of the children have ever known has been in the aforesaid Berlin apartment, where Plaintiff currently resides.

19.    In calendar year 2005, the Defendant traveled to her family's home in Salt Point, New York for the summer vacation.  In the month of August, 2005, the Defendant returned to Berlin.  Soon after the Defendant's return, the parties mutually agreed to enroll their son into the German City Kindergarten system, known as KITA.  On October 31, 2005, the Defendant left Berlin to visit with her family in New York once more.  The Defendant returned to Europe from such visit on January 31, 2006 – spending one week in Bristol with other family members.  At such time, the Plaintiff met the Defendant and the children in Bristol and the entire family returned to their aforesaid home apartment in Berlin.  After such return, the parties' son was enrolled again in the same City Kindergarten system, known as KITA, which he attended until the Defendant improperly refused to return to the parties' home, as shall be discussed at greater length hereinbelow.  The City Kindergarten system is a full-time, eight hour per day school program, with a full meal program and an advanced curriculum for early learning, arts and crafts and physical play.  (Nursery school in America is the closest equivalent to think of in comparison, but American nursery school programs cannot be called the equivalent of a German KITA program.)  The parties' son and even their little daughter also attended a music program in Berlin.  All of these programs are offered to the parties at a low cost, (20 Euro per child), through the German social system.  The Defendant has chosen to take the parties' children away from the Plaintiff, away from their home and away from a stable and secure environment that would provide a solid foundation for their future development – in direction contradiction to the plans that the parties had established when they were married and made the decision to have children.

20.    During the course of Plaintiff's marriage to the Defendant, the Plaintiff never refused the Defendant the ability to travel to New York to see her family. In fact, the Plaintiff paid for all such visits and holidays.

21.    During the parties' marriage, it became their custom for the parties to spend a significant portion of their summers with the Defendant's family in Salt Point, New York, and for the Defendant to spend the Thanksgiving, Christmas and Russian New Year holiday time period with her family. This custom was only slightly modified following the birth of the parties' children.

22.    In calendar year 2002, the Defendant left the parties' home in Germany at the beginning of the summer and traveled to New York to visit with her parents. Plaintiff joined her in the months of July and August, as Plaintiff was required to remain in Berlin in connection with his position of employment until the end of June each year. The Defendant had no such constraint as she was not employed. Thereafter, the Plaintiff would exercise his lengthy eight (8) weeks of summer vacation, and would "join-up" with the Defendant at her family's aforesaid home in Salt Point, New York. The parties returned to their home in Berlin at the end of August, 2002. During the winter holiday time period the Defendant returned to visit with her family in New York. In mid-January, 2003, the Defendant returned to the parties' home in Berlin.

23.    In calendar year 2003, the parties' son was born. In turn, the Defendant was restricted from flying with him for several months. In the beginning of the fall of 2003, (09/05/03 to be exact), the Defendant traveled to New York so as to have the parties' son baptized in the Russian Orthodox Church. Plaintiff was able to use vacation time to travel to New York and attend the baptism. (Although Plaintiff does not believe in the existence of God, Plaintiff has never stopped the Defendant or her family from insisting that the parties' children be raised under the Russian Orthodox Church. Plaintiff, however, holds other concerns about the Defendant's and her family's religious zealousness, but Plaintiff will

discuss this at a later point in this complaint.) The Defendant returned to the parties' home in Berlin on 09/23/03. Later that year, between 12/15/03 through 01/11/04, the Defendant and the parties' son traveled to New York to spend the winter holiday with her family. On 01/11/04, the Defendant and the parties' son returned to the parties' home in Berlin.

24.    In calendar year 2004, the Defendant and the parties' son left the parties' home in Berlin on June 2nd, and traveled to New York to visit with the Defendant's parents. As the parties had done in the past, the Plaintiff "joined-up" with the Defendant and their son in the months of July and August, as the Plaintiff was required to remain in Berlin in connection with his position of employment until the end of June. On August 24, 2004, the Defendant and the parties' son returned to the parties' home in Berlin. Because of the Defendant's pregnancy with their daughter, the Defendant did not visit with her family during that period of time between Thanksgiving, 2004 and the end of the Russian New Year celebrations in mid-January, 2005. On January 5, 2005, the Defendant gave birth to their daughter in Berlin.

25.    In calendar year 2005, the Defendant asked the Plaintiff for permission to allow her and both of the parties' children to spend the entire summer with her family members in New York State. As per the established custom, the Plaintiff gave the Defendant the permission she sought. For the summer of 2005, the Defendant and the parties' children vacationed with the Defendant's family in Salt Point, New York. At the end of August, 2005, the Defendant and both of the parties' children returned to live at the parties' apartment in Berlin. During the holiday time period of Thanksgiving, 2005, through the end of the Russian New Year celebrations in January, 2006, (specifically between 10/31/05 – 01/31/06), the Plaintiff also permitted the Defendant and both children to visit with the Defendant's family in Salt Point, New York. On January 31, 2006, the Defendant returned to the parties' home in Berlin with both children.

26.     All of these long periods of separation between the parties and their children were emotionally and mentally draining upon the Plaintiff, who missed his family a great deal and felt terribly alone without them; but, Plaintiff had to work in order to continue to support the growing family's needs.

27.     Plaintiff hereby states that he has always tried to balance the Defendant's desire to spend time with her family, especially in light of the great distance between Berlin, Germany and Salt Point, New York.  Plaintiff further states that he does not believe that the Defendant truly respected the Plaintiff's feelings or was sufficiently concerned with the children's need to be with their father.  This has been very heart-wrenching and distressing to the Plaintiff throughout the years.

28.     Plaintiff is now concerned that the Defendant has committed an illegal act by refusing to return the parties' children to the parties' home in Berlin – as the Defendant knows that their children are growing up and that it would be impossible for the Defendant to spend lengthy periods of time away from her family while the children are required to attend school studies.  Plaintiff hereby states his belief that the Defendant has planned her move to New York, as the Defendant knew how much harder it would be if the children were attending advanced school on a full-time basis in Berlin.  In turn, Plaintiff further believes that the Defendant is thinking of only her own selfish needs and desires – in complete derogation to the plans that the parties made together for their future, which was to remain residents of Berlin, and to raise their children in Germany.

29.     Accordingly, Plaintiff is compelled to intervene and to enforce his rights as father under the instant Complaint, before it is too late for the parties' children.

30.     In the spring of 2006, the Defendant once again sought the Plaintiff's permission to allow the Defendant and both of the parties' children to spend the entire summer with the Defendant's family members in New York State.  Once again, the Plaintiff acquiesced in the Defendant's request; and, the

parties also made plans to have the Plaintiff's mother, Lydia Plotnikov, (who was residing in San Francisco), join the entire family in Salt Point, New York for the months of Plaintiff's vacation period in July and August, 2006. (The actual invitation was made by the Defendant to Plaintiff's mother.) Accordingly, on May 31, 2006, the Defendant left the parties' home in Berlin with both children and arrived in New York State.

31.     Throughout the parties' marriage, the parties have been constantly confronted by the Defendant's family members, who repeatedly demand that the parties return to America so that the Defendant and both children can be together with the rest of the Defendant's family. This issue has created a great deal of division between the parties, as the Defendant has increasingly pressured the Plaintiff to relocate to America. For many reasons, Plaintiff hereby states that he does not wish to relocate from Berlin or to obtain a different position of employment. In addition, Plaintiff states that he has argued with the Defendant about the fanatical religious nature of her family members, as well as about the excessively heavy smoking and alcohol consumption engaged in by the Defendant's family. {The Defendant's father died at the approximate age of sixty-one (61) from throat cancer.} Those members of the Defendant's family who reside in the aforesaid Salt Point residence are alcoholics, who drink excessively every day. In addition, they each smoke between 1-2 packs of cigarettes on a daily basis. Although the Defendant does not smoke, she and the children are constantly exposed to ridiculously high levels of second-hand smoke, (even though attempts are made to smoke outside when possible), all of which is extremely unhealthy and dangerous, especially for our children. Plaintiff has also expressed his concern that the Defendant's continued exposure to her family is turning her into an alcoholic, as the Plaintiff has observed her drinking on almost a daily level. Plaintiff has expressed great concern about what this exposure will mean to the parties' children. As a result, Plaintiff believes that

he has increasingly been viewed as "the family enemy", despite expressing his concern for all of their respective health conditions. Naturally, this situation has caused great stress upon the parties' marriage.

32.    It was the Plaintiff's hope that he could use the summer vacation period in 2006, to repair problems with the parties' marriage, and to obtain some balance within the marriage, by using his own mother's presence and influence within the Salt Point residence. Unfortunately, this did not work out at all. During the summer vacation, things became so hostile between Plaintiff's mother, the Defendant and the Defendant's family members, that Plaintiff was forced to take his mother to a friend's home in the Bronx, where the Plaintiff stayed with his mother for a few days awaiting the date of his mother's return flight to San Francisco. After his mother flew back to California, the Plaintiff returned to the Salt Point residence until his own summer vacation was over.

33.    Although the parties discussed the possibility of divorce or separation during Plaintiff's summer vacation in 2006, nothing was affirmatively agreed upon.

34.    On the day before the Plaintiff was scheduled to leave New York, in order to return to his job, in fulfillment of his contractual obligations, Plaintiff was threatened by the Defendant, (as he has been threatened on many occasions prior to that date), that she would go to the U.S. State Department to have Plaintiff's citizenship revoked if he did not sign a document that allowed the Defendant to have physical custody of the parties' children. Under such duress, threat and pressure, Plaintiff signed such document, but demanded that a clause be inserted at the end of same which guaranteed that Plaintiff would not lose his rights to the parties' children. A copy of such document has been annexed and attached hereto as **Exhibit "A"**. Such document, which is dated 08/13/06, was produced through the computer at Defendant's sister's home. Plaintiff hereby states that he did not have a chance to speak to a lawyer about such document; and, Plaintiff hereby contends that he was pressured and placed under threat and duress when asked to sign same. Plaintiff was also afraid that if he didn't sign same, that he

might never see his children again. Plaintiff also states his belief that the Defendant and her family lied to him and misrepresented the fact that the Defendant needed such document for legal purposes if the children got hurt while she and the children were staying in New York. Plaintiff further states that the Defendant also told the Plaintiff that she was coming back to their home in Berlin, and that by signing such document, the Plaintiff was not consenting to a permanent move by the Defendant and children away from their home in Berlin. Plaintiff hereby states that he wishes that he had never signed such document, and that he feels that he was tricked into agreeing to sign same. Plaintiff also contends that he signed such document under mistake, misrepresentation, possible fraud, coercion, threat, duress and without full understanding of its legal meaning and without knowledge of his legal rights. Plaintiff is also compelled to state, that when the Defendant and her brother-in-law, Jeff DeLong, were pressuring Plaintiff to sign the aforesaid document, the Defendant cursed and insulted the Plaintiff, while both the Plaintiff and Jeff DeLong told the Plaintiff that it was his fault that the parties' marriage was over. These actions made the Plaintiff feel sick to his stomach at that point in time. Plaintiff was also weak from taking antibiotics because of a dental problem that he had sustained; and, his shoulder was in great pain from an injury that he had suffered. By reason of the foregoing, Plaintiff also believes that the Defendant and her family took advantage of his weakened physical condition and used undue pressure to force him to sign the aforesaid document.

35.    After Plaintiff returned to Berlin, the Defendant informed the Plaintiff that she had made the decision to terminate the parties' marriage, in that she wished to enter into a legally binding Separation Agreement. Unfortunately, the Defendant also informed the Plaintiff that she did not want to return to Berlin; but, that she wished to remain living in New York with the parties' children. Although Plaintiff objected to the Defendant's expressed plans, the Defendant informed the Plaintiff that she had retained an attorney, who told her that the children's father, (the Plaintiff herein), could not compel the

Defendant or the children to return to Berlin, that the children's father, (the Plaintiff herein), could not obtain custody of the children, and that the children's father, (the Plaintiff herein), could not prevent the Defendant from obtaining a divorce if the Plaintiff chose not to enter into a Separation Agreement.

36.    Plaintiff was very upset with the Defendant's decision, actions and statements; not only because the Defendant wanted to terminate the parties' marriage, but also because of what such decision would mean to the Plaintiff's relationship with the parties' children.   In turn, and accepting the Defendant's word as to the status of his own legal rights, the Plaintiff entered into negotiations with the Defendant in an attempt to amicably and peacefully dissolve the parties' marriage and to protect his own rights to the children.   At the same time, Plaintiff requested to use personal vacation time from his position of employment, (that he would usually use in the winter months with his family), so as to allow the Plaintiff to travel to the home of the Defendant's family in New York, in order to see the children and to try to convince the Defendant that they did not need to enter into a legal separation.   Plaintiff's request for vacation time was granted by his employer from December 11 – 19, 2006.

37.    In order to travel to New York, Plaintiff purchased a round-trip ticket on an international flight on Continental Airlines.   Upon his arrival in New York on December 11, 2006, no one met the Plaintiff at the airport.   Instead, the Plaintiff had to take a train to Poughkeepsie and a taxi from Poughkeepsie to Salt Point.   In connection with such arrival, Plaintiff has annexed a copy of his current Passport as **Exhibit "B"**.   Such Passport was issued by the United States of America on January 12, 2000, and will not expire until January 11, 2010.   Plaintiff has affixed a red tab to that page of his Passport which establishes that date of Plaintiff's last entrance into the United States of America on December 11, 2006.

38.    During Plaintiff's stay at the Salt Point residence, the parties argued about the Defendant's decision to terminate the marriage, and to keep the children away from the parties' home in

Berlin. On the second day after Plaintiff's arrival, (12/13/06), Plaintiff was told by the Defendant that she had consulted with her attorney, and that she was going to take Plaintiff to Court unless Plaintiff agreed to sign a Separation Agreement that Defendant's attorney had prepared. This was the first time that Plaintiff ever saw a Separation Agreement. In turn, Plaintiff told the Defendant that he needed to consult with someone about this matter. This made the Defendant very angry.

39.     When Plaintiff refused to sign the Separation Agreement on December 13, 2006, the Defendant and her mother left him alone at the Salt Point residence with the parties' two young children, and refused to speak with the Plaintiff. Neither the Defendant nor her mother told the Plaintiff where they were going. Later in the day, Defendant's brother, Jeff DeLong, told the Plaintiff that that the Defendant was returning from her lawyer's office with legal papers; and, that Defendant's brother was asked to serve such legal papers upon the Plaintiff. After Jeff DeLong told the Plaintiff about this information and plan, he left the home to go to work. His wife, (Plaintiff's sister-in-law), had left for work before him. One day before the Defendant threatened the Plaintiff that he was going to be in a lot of trouble, the Defendant also told the Plaintiff that she was filing separate family court charges against him; but, that Court could be avoided if Plaintiff signed the proposed Separation Agreement. After Jeff DeLong went to work, Plaintiff was left in Salt Point, New York, in the woods, with no car, and with two young children. Plaintiff was scared, confused, shocked and devastated.

40.     In response to the foregoing situation, the Plaintiff searched the internet for a local attorney, and Plaintiff made contact with Thomas F. Vasti, III, Esq. Pursuant to certain brief and preliminary discussions about Plaintiff's factual circumstances, Plaintiff learned that he was not without significant rights to the parties' children; and, that Plaintiff is capable of compelling the Defendant to return the parties' children to their home in Berlin, Germany. Because of the advice that Plaintiff received from Mr. Vasti, wherein Plaintiff learned that his case would involve the Uniform Child

Custody Jurisdiction and Enforcement Act, (NYS Domestic Relations Law Article 5-A), and the Hague Convention on the Civil Aspects of International Child Abduction, (a/k/a "Hague Convention"), T.I.A.S. No. 11670, 1988 WL 411501, and the International Child Abduction Remedies Act, (I.C.A.R.A. – 42 U.S.C.A. Chapter 121, §§11601 et. seq.), and because Mr. Vasti further advised the Plaintiff that his case was quite complex and would require legal advice in New York and Germany, Plaintiff elected to leave New York and America immediately – as Plaintiff was also told by Mr. Vasti that if service of court documents was made upon the Plaintiff by his mother-in-law or any other person, then Plaintiff would be forced to submit himself to the jurisdiction of New York Courts, which could adversely affect his rights to litigate the custody rights under the Hague Convention and under German Law.

     41.    In turn, Plaintiff packed his hand-bag on December 13, 2006, and waited for the Defendant and her mother to return to the Salt Point residence. Plaintiff waited just inside said residence with the children, until Plaintiff saw his mother-in-law's car coming down the long, wooded driveway. Plaintiff waited like this, because he did not want to leave the young children alone for any period of time. When the car arrived inside the garage, which is attached to the interior of the house, Plaintiff walked into the garage to make sure that the car was parked, and that the Defendant and her mother had gotten out of the car. Plaintiff told the Defendant that he had to leave immediately; and, with that, Plaintiff ran out of the house into the woods with his packed hand-bag. Neither the Defendant nor her mother ever caught up with the Plaintiff; and, no person ever served any legal documents upon the Plaintiff. When the Plaintiff reached a semblance of civilization, he obtained transportation to the Poughkeepsie train station, and boarded a train to a friend's apartment in New York City. Thereafter, Plaintiff rescheduled travel arrangements and flew out of Toronto in order to arrive in Berlin on 12/16/06.

42.    Plaintiff hereby states that he has been very involved in both children's lives; and, Plaintiff is greatly disturbed by all of the aforesaid events that have transpired since May 31, 2006.

43.    In turn, and by reason of the happening of each of the occurrences set forth hereinabove, Plaintiff makes this complaint in order to compel the return of his wrongfully removed and wrongfully retained children to their proper, legal home in Berlin, Germany, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, (a/k/a "Hague Convention"), T.I.A.S. No. 11670, 1988 WL 411501, and the International Child Abduction Remedies Act, (I.C.A.R.A. – 42 U.S.C.A. Chapter 121, §§11601 et. seq.), the pertinent provisions of which are hereby cited and relied upon by the Plaintiff:

(A).    <u>Article 1 of the Hague Convention</u> provides that, "the objects of the present Convention are – (a). to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (b). to ensure that rights of custody and access under the law of one Contracting State are effectively respected in the other Contracting States."

(B).    <u>Article 3 of the Hague Convention</u> provides that, "The removal or the retention of a child is to be considered wrongful where – (a). it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b). at the time of removal or retention these rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."

(C).    <u>Article 4 of the Hague Convention</u> provides that, "The Convention shall apply to any child who was habitually resident in a Contracting State immediately before any breach of custody or access rights.  The Convention shall cease to apply when the child attains the age of sixteen (16) years."

(D).    <u>Article 12 of the Hague Convention</u> provides that, "Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceeding before the judicial or administrative authority of the Contracting State where the child is, **<u>a period of less than one year has elapsed</u>** from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith. …" *(Underlining and bold text added for emphasis.)*

Page 15 of 19

(E).    <u>Article 16 of the Hague Convention</u> provides that, "After receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of **the Contracting State to which the child has been removed** or in which it has been retained **shall not decide on the merits of rights of custody** until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice." *(Underlining and bold text added for emphasis.)*

(F). <u>Section 11601 of the International Child Abduction Remedies Act, (under 42 U.S.C.A. Chapter 121)</u>, provides as follows: "(a). The Congress makes the following findings: (1). The international abduction or wrongful retention of children is harmful to their well-being. (2). Persons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention. (3). International abductions and retentions of children are increasing, and only concerted cooperation pursuant to an international agreement can effectively combat this problem. (4). The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights. Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.   The Convention provides a sound treaty framework to help resolve the problem of international abduction and retention of children and will deter such wrongful removals and retentions. ... (b). Declarations.   The Congress makes the following declarations: (1). It is the purpose of this chapter to establish procedures for the implementation of the Convention in the United States. (2). **The provisions of this chapter are in addition to and not in lieu of the provisions of the Convention**. (3). In enacting this chapter the Congress recognizes – (A). the international character of the Convention; and (B). the need for uniform international interpretation of the Convention. (4). The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." *(Underlining and bold text added for emphasis.)*

(G).    <u>Section 11603 of the International Child Abduction Remedies Act, (under 42 U.S.C.A. Chapter 121)</u>, provides as follows: "(a). Jurisdiction of courts.   The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention. (b). Any person seeking to initiate judicial proceedings under the Convention for the return of the child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed. ..."

44.     Between the middle of December and the present date, Plaintiff has been embroiled in a Dutchess County Family Court matter, commenced by the Defendant, pursuant to Article 6 and Article 8 of the New State Family Court Act, and pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act, (as contained within NYS Domestic Relations Law Article 5-A).   A copy of the Plaintiff's petitions, (and the Temporary Order of Protection that was issued in connection therewith), have been annexed hereto, collectively, as **Exhibit "C"**.

45.     Plaintiff has filed a limited appearance in the above State Court proceeding, for the purposes of submitting a motion to dismiss such proceeding on the grounds that the Dutchess County Family Court did not acquire "In Personam" Jurisdiction over the Plaintiff, (and on the further basis that the process server submitted a perjured affidavit); and, on the additional grounds that the Uniform Child Custody Jurisdiction and Enforcement Act, (NYS Domestic Relations Law Article 5-A), is preempted by the Hague Convention on the Civil Aspects of International Child Abduction, (a/k/a "Hague Convention"), T.I.A.S. No. 11670, 1988 WL 411501, and the International Child Abduction Remedies Act, (I.C.A.R.A. – 42 U.S.C.A. Chapter 121, §§11601 et. seq.), thereby rendering the State Court without the ability to acquire "Subject Matter" jurisdiction over the parties' dispute concerning the custody, residence and/or repatriation of the parties' children.

46.     The aforesaid motion practice, which took place over a three month time frame, has been deemed fully submitted before the Dutchess County Family Court, (and assigned to the Hon. Damian J. Amodeo); and, as of the date of the instant Complaint, no decision has been rendered.

47.     Plaintiff has not instituted any action in any other Court seeking the same relief set forth herein; and, Plaintiff is not aware of the existence of any other action having been submitted to any Court seeking the same relief set forth herein.

**WHEREFORE,** and by reason of the totality of the foregoing premises, Plaintiff hereby respectfully requests that this Honorable Court enter an Order which provides for the following forms of relief: (A). The dismissal of both of the Defendant's pending Family Court petitions, (together with the Temporary Order of Protection issued in connection therewith), by reason of the preemption of the Hague Convention on the Civil Aspects of International Child Abduction, (a/k/a "Hague Convention"), T.I.A.S. No. 11670, 1988 WL 411501, and the International Child Abduction Remedies Act, (I.C.A.R.A. – 42 U.S.C.A. Chapter 121, §§11601 et. seq.), over the Uniform Child Custody Jurisdiction and Enforcement Act, (NYS Domestic Relations Law Article 5-A); and, (B). The issuance of  an Order, pursuant to the applicable provisions of the Hague Convention and the I.C.A.R.A., compelling the Defendant to immediately return the parties' children to the parties' home apartment within the City of Berlin, Germany, for the purposes of conducting and concluding German litigation concerning the custody, residence and visitation rights with regard to the parties' children; and (C). The granting of such other and further relief as to this Court may seem just, reasonable and proper.

Dated:  **Pleasant Valley, New York**
        **May *22*, 2007**

                                     **Respectfully Submitted By:**

                                   **THOMAS F. VASTI, III, ESQ.**
                                   **VASTI & VASTI, P.C.**
                                   **Attorneys for Plaintiff**
                                   **Post Office Box 656**
                                   **1733 Main Street, (Route 44)**
                                   **Pleasant Valley, NY  12569**
                                   **(845)/ 635 – 8866**

## VERIFICATION

CITY OF BERLIN                    )
                                 )
COUNTY OF _____         )
                                 )  ss.:
COUNTRY OF GERMANY                )
                                 )

**DMITRI PLOTNIKOV**, being duly sworn, says:

I am the Plaintiff in the foregoing action, and I have read the annexed Complaint and know the contents thereof and the same are true to my own knowledge, except as to those matters therein which are stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

_____
**DMITRI PLOTNIKOV**

Sworn to before me this
_____ day of May, 2007.

_____
Notary Public

Page 19 of 19